IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JERRY D. WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 05-3496-CV-S-ODS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING FINAL DECISION OF
COMMISSIONER OF SOCIAL SECURITY**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff, Jerry D. Williams, filed applications for Disability Insurance Benefits and Supplemental Security Income Payments on October 1, 2003. Plaintiff alleges to have been under a disability since August 11, 2003. The claim was denied initially and a hearing before Administrative Law Judge Linda D. Carter was held on September 30, 2004. The Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review on September 2, 2005. Thus, the decision of the ALJ remains the final decision of the Commissioner relevant to this appeal. Plaintiff filed his District Court Complaint on October 18, 2005.

### A. MEDICAL HISTORY

At the time of the hearing Plaintiff was 48 years old. He attended school through the eighth grade and subsequently obtained a General Equivalency Diploma. He later obtained a college degree with a major in accounting. He has not been gainfully employed since

August, 2003, although he worked temporarily as a part-time janitor. Afterwards he worked three days as a general laborer but was terminated for making too many mistakes. In the summer of 2004 he helped a friend by mowing lawns twice, evidently without compensation.

The Plaintiff's work history includes: serving as a specialist in the U.S. Army from 1984 to 1988; a driver in the parts business from 1988 to 1997; debt collector in 1997 and 1998; newspaper delivery person, 1997 and 1998; clerk/driver in 1998; production worker, pre-stress cement casting in 1998; grocery store clerk, 1998 and 1999; battery store clerk, 1999 to August, 2002; debt collector in October of 2002; production worker at a dough facility from February to August, 2003; and as a part-time janitor from September 2003 until May 2004. He has not tried to obtain additional work since May 2004.

The Plaintiff complains of affective disorders and anxiety related disorders. The record also shows a history of seizure disorder, bursitis in the right shoulder, and right ankle soreness and tenderness secondary to an open reduction internal fixation of a fracture sustained in August 2001. The Plaintiff also complains of left knee pain, neck strain, multiple joint and muscle aches and mild headaches. The ALJ did not find a medically determinable severe impairment or impairments related to any of Plaintiff's physical complaints and Plaintiff does not appeal that finding. Plaintiff's affective and anxiety related disorders were found by the ALJ to cause significant vocationally relevant limitations.

Plaintiff was treated at St. John's Physicians Clinic between December of 1998 and August 2000. It was initially thought that Plaintiff was having episodic seizures. A CT scan of the brain was unremarkable. An EEG suggested a "probable" focal seizure disorder. As of August 2, 2000, there had been no additional seizures and Plaintiff's physical and neurological examinations were unremarkable. The Plaintiff was not interested in further medicating against seizures. He reported that he was tired. The record reflects that he was working 50 to 55 hours a week. If Plaintiff had a focal seizure disorder, it was found to be stable at that time. Dr. John D. Baurichter thought the Plaintiff had some minor depressive symptoms but ruled out major depression.

Dr. Lester Conduff treated Plaintiff from November 2000 through at least March 2003. Relevant to this discussion is the fact that Plaintiff frequently and consistently complained of recurrent depression beginning in March 2001. Plaintiff reported that he had episodes of depression prior to that date and had been treated with Zoloft. Plaintiff complained of continued anxiety and depression in November 2001 and continued medicating with Serzone. Plaintiff again reported depression in February, May, June and July 2002. During the July visit, the Plaintiff stated that he had recently seen a psychiatrist, been diagnosed with bipolar disorder and had begun to medicate the disorder. Dr. Conduff's records also reflect that Plaintiff may have sustained a mild seizure without loss of consciousness in February 2003.

In July 2003 Plaintiff was admitted to Cox Medical Center complaining of a "nervous breakdown" and some suicidal/homicidal ideation. He was discharged with the diagnosis of bipolar disorder-NOS, depression with suicide ideation, panic attacks with agoraphobia, "questionable" seizures and mild symptoms of depressed mood. Plaintiff was admitted a second time in August of 2003 following an arrest for DUI. Plaintiff denied ingesting alcohol and believed his medications resulted in his arrest. Because of the DUI, he discontinued his medications and a week later was admitted to Cox Medical Center. The admitting diagnosis reflected a Global Assessment of Functioning ("GAF") score of 35 indicating a major impairment in occupational, social, family relations, judgment, thinking or mood as well as an impairment in reality testing or communication. Following restoration of his medications Plaintiff quickly improved and was discharged three days later. His discharge diagnosis was major depressive disorder-recurrent with suicidal ideation, panic attacks with agoraphobia, "questionable" seizures and a GAF of 65.

Subsequently, Plaintiff was treated at the Jordan Valley Community Health Center from August 2003 until July 2004. The Plaintiff complained of depression and anxiety, anger spells and panic attacks at work. There was no treatment for any seizure activity. In July 2004 Plaintiff was being treated for fatigue, anxiety and bipolar disorder. By July 13, Plaintiff was seeing a psychiatrist and continued to report fatigue and being "still somewhat depressed."

An initial psychiatric evaluation was conducted by Burrell Behavioral Health on January 6, 2004. Plaintiff completed a Mood Disorder Questionnaire which scored positive for bipolar disorder. He also described symptoms of panic and anxiety. It was also suggested that Plaintiff read *The Purpose Driven Life* by Rick Warren. He was diagnosed with bipolar disorder II, panic disorder and agoraphobia. His GAF was found to be 50 which the ALJ believed to be inconsistent with the narrative findings as well as the record as a whole. The ALJ noted that the GAF findings were made by Ms. Marilyn Corson, RN, BC, P/MHNP. The ALJ found that such an individual cannot provide a medical opinion and that her statements were not entitled to controlling weight.

On August 18, 2004, Plaintiff was admitted to Cox Medical Center following an accidental overdose of Darvocet in an effort to treat a toothache. The Plaintiff denied feeling suicidal, feeling hopeless or worthless at that time. He was pleasant and cooperative, alert and oriented times three. He was assessed with bipolar disorder type II, history of substance abuse, and a GAF of 45 indicating a serious impairment in social and occupational functioning as well as serious symptoms of suicidal ideation, severe obsessional rituals and frequent shoplifting. Again, the ALJ noted that the GAF of 45 appeared to be inconsistent with the narrative and with the record as a whole.

As of September 2004, Plaintiff was receiving the following medications: Klonopin, Trazodone, Trileptal, Lexapro and Abilify. The record reflects that Plaintiff's medications have been changed periodically over the years in an effort to get him "leveled out."

At the hearing Plaintiff testified that he drives on a regular basis and that he drove himself to the hearing. He worked part-time until July 2004. He was terminated from his last position as a general laborer due to excessive mistakes. He has been dismissed or terminated by the temporary agency and was not currently seeking work. He reported morning stiffness and soreness in his right ankle once a week and problems with standing or walking more than four or five hours a day. He also reported bursitis in his right shoulder and weakness in the upper right extremity.

-4-

Case 6:05-cv-03496-ODS   Document 11   Filed 05/15/06   Page 4 of 12

## B. The Administrative Hearing

Plaintiff's affective disorder began in 1998 and became worse in August 2002 when his mother was diagnosed with cancer. He becomes manic every one or two weeks and the manic phase lasts up to 48 hours. During that time he cannot sleep, his mind races, he walks and paces the floor. When not in a manic phase, Plaintiff is depressed. He has been known to sleep 16 or 18 hours a day.

### (I) Daily Activities

Normally, he will get out of bed, prepare breakfast for his son and drive him to school. He returns home, goes back to bed and stays there until noon or 1:00 p.m. He goes back to bed because he feels tired or because there is nothing else he wants to do. He reports constant fatigue. He picks up his son from school at 2:30 p.m., helps his son with his homework, then watches baseball or a movie on television. He goes to bed about 9:00 or 9:30 p.m. He washes dishes and mows the lawn, cleans his room and supervises his son. He lives with his mother who, at age 72, was still employed outside the home. He denies shopping on a regular basis due to his panic disorder. He becomes very nervous and experiences tightness in his chest when around a lot of people. He denies going to church on a regular basis and prefers not to go out to eat or to a movie theater. His hobbies are watching baseball and basketball. He would like to go to a gym but is unable to afford it. He visits with friends infrequently, maybe once every two months. He reports a few crying spells but reports none within the last six months to a year. He reports memory deficiencies and concentration problems. He tends to invert numbers and does not read often. He has no problem getting along with his mother or his friends. His son has had behavioral problems at school which sometimes contributes to his stress. He does not believe he could perform full time work as a janitor because he would "just fizzle out."

### (II) Work Profile

The Vocational Expert ("VE") characterized Plaintiff's work profile as that of a production worker, medium work, unskilled labor, performed at the medium exertional level. The ALJ asked the VE to assume that Plaintiff was 47 to 48 years of age, possessed more

-5-

than a high school education, obtained a GED and a college degree and has past work experience as a sales clerk, semi-skilled laborer, driver, collection clerk, skilled laborer, all performed at either a sedentary or medium exertional level.  The VE was further asked to assume Plaintiff's history included seizure disorders, post-traumatic stress disorder, Hepatitis C, bipolar disorder, major depressive disorder, panic disorder with agoraphobia, a right ankle fracture with continuing pain and stiffness, bursitis in the right shoulder with continuing pain and is limited to light work as defined by the regulations.  The VE was further asked to assume that Plaintiff needed to avoid exposure to or climbing significant unprotected heights, potentially dangerous and/or unguarded moving machinery and commercial driving.  The VE was asked to assume that Plaintiff could do work that allowed alternating sitting and standing, changing positions every one to two hours and that the work environment needed to include even surfaces upon which to walk.  The VE was asked to assume that the work could not involve overhead reaching with the right arm with weights greater than five pounds.  The hypothetical also assumed the need for a low stress work environment with simple, repetitive tasks and no public contact.  The VE stated that light, unskilled jobs were available in the national economy including a cleaner and an assembler of small products.  Those positions are available in significant numbers both within the United States and within the State of Missouri.

The VE testified that there were inconsistencies between the Dictionary of Occupational Titles ("DOT") description of those sample jobs and the hypothetical jobs. The VE explained that the DOT's do not address issues like customer service, public contact, stress, reputation and overhead reaching.  Her conclusions in that regard were based upon professional experience identifying jobs through job or site surveys, employer interviews and reviewing the literature. The VE further testified that should the ALJ find Mr. Williams' description of his limitations credible, specifically, that he would be unable to regularly sustain eight hours of exertional work at any level or up to two hours of concentration and attention, then he would be unable to engage in competitive work.

-6-

Case 6:05-cv-03496-ODS   Document 11   Filed 05/15/06   Page 6 of 12

### (III) ALJ Findings

The ALJ found that Plaintiff's statements concerning his impairments and their impact on his ability to work were generally not credible in light of the medical treatment required, discrepancies between the Plaintiff's assertions and the record as a whole and the report of treating and examining practitioners. She further found that Plaintiff's reported GAF scores were inconsistent with the record as a whole and that Plaintiff had no impairment that meets the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 C.F.R., Part 404, Subpart P, and Appendix 1). The ALJ gave consideration to the nature, duration and intensity of pain, aggravating factors, medications, treatment, functional restrictions and the Plaintiff's daily activities. She noted that no medical source has stated that the Plaintiff cannot do any type of work.

The ALJ noted Plaintiff's history of two brief psychiatric hospitalizations in July and August 2003 and the need for psychiatric and medication management. She further noted that the most current mental evaluation demonstrated that the Plaintiff was not manic, suicidal, psychotic or depressed and that Plaintiff possessed logical thought processes with orientation times three. Finally, she noted that a State Agency psychologist concluded in November 2003 that Plaintiff had no marked or extreme functional limitations, that his activities of daily living, social functioning, concentration, persistance or pace, were mildly limited. The ALJ concluded Plaintiff's complaints suggest a greater severity of symptoms than is shown by the objective medical evidence alone. She found Plaintiff could not return to his past relevant work but that he could perform light, unskilled jobs such as that of cleaner or assembler of small parts.

### II. DISCUSSION

Plaintiff claims the ALJ erred in the following respects:

1. Failure to elicit a reasonable explanation for conflicts between occupational evidence provided by the vocational expert and the Dictionary of Occupational Titles;
2. Failure to assess a proper residual functional capacity, and;

3.     Failure to conduct a proper credibility analysis.

"[R]eview of the [Commissioner's] decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence  is evidence which reasonable minds would accept as adequate to support the [Commissioner's] conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

## A.  FAILURE TO ELICIT A REASONABLE EXPLANATION FOR CONFLICTS BETWEEN OCCUPATIONAL EVIDENCE PROVIDED BY THE VOCATIONAL EXPERT AND THE DICTIONARY OF OCCUPATIONAL TITLES

Plaintiff argues that a conflict exists between the testimony of the VE and the DOT relative to the VE's testimony concerning jobs which Plaintiff can perform.  SSR 00-4p provides in pertinent part:

> Occupational evidence provided by the VE . . . generally should be consistent with the occupational information supplied by the DOT . . . Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict.  The [ALJ] must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

It is impractical to expect or require the DOT to fully and completely describe each characteristic of the multitude of jobs available in the national economy.  Variances can be expected because different jobs are performed in different ways depending upon many variables including location, the nature of the enterprise, the composition of the clientele, consumer or customer, the personality of the business, expected and natural distinctions among supervisors, strengths and weaknesses of employees and other variables too

-8-

numerous to enumerate. The DOT recognizes this inherent impossibility. Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000) (emphasis added):

> The DOT lists maximum requirements of occupations as <u>generally</u> performed, not the range of requirements of a particular job as it <u>is</u> performed in specific settings. A VE . . . or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

Here, the VE testified that Plaintiff could perform the jobs of cleaner or a small parts assembler. The VE acknowledged discrepancies between her testimony and the DOT with the following explanation:

> Your Honor, the DOT's not going to address issues like customer service, public contact, stress, repetition, overhead reaching. Those would have to be from experience.

The VE went on to acknowledge that her testimony was based upon her professional experience, identifying jobs through job or site surveys, employer interviews and reviewing the literature.

If Plaintiff's position were sound, expert testimony would be unnecessary at administrative hearings. All the potential requirements of jobs would be listed in the DOT and it would not be necessary for an expert to explain or clarify the definitions. Obviously, it is not possible for the DOT's to address every possible variable and anticipate every possible conflict. A VE, trained and experienced, is qualified to reconcile any such conflict. With that assistance from the VE, the ALJ was justified in concluding that Plaintiff was capable of performing the jobs identified by the VE.

### B. FAILURE TO ASSESS A PROPER RESIDUAL FUNCTIONAL CAPACITY

Plaintiff faults the ALJ for finding:

> After careful consideration of the medical evidence in its entirety, including the opinions of the treating sources, state agency medical consultants, symptoms alleged by the Plaintiff and credibility, the undersigned finds that Plaintiff retains the residual functional capacity to perform the exertional demands of light work.

The hypothetical question propounded by the ALJ to the VE fairly encompassed Plaintiff's physical impairments and limitations caused by Plaintiff's affective disorders. The hypothetical concluded consideration of Plaintiff's seizure disorders, post-traumatic stress

-9-

Case 6:05-cv-03496-ODS   Document 11   Filed 05/15/06   Page 9 of 12

disorder, Hepatitis C, bipolar disorder, major depressive disorder, panic disorder with agoraphobia, mobility limitation resulting from his ankle fracture, bursitis in the right shoulder, a need to avoid climbing or potentially dangerous machinery and commercial driving, even surfaces, the need for low stress work involving simple and repetitive activities and no contact with the public. Each of these limitations is fairly supported by the medical record. The ALJ omitted none of Plaintiff's limitations which are supported by the medical record.

The ALJ found some of Plaintiff's self-reported limitations to be less than fully credible. The ALJ is justified in doing so where the objective medical evidence does not support the degree of symptoms alleged. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). The ALJ was also justified in discounting the GAF assessments of nurse Marilyn Corson. While conceding that Ms. Corson is unqualified to offer a medical opinion, Plaintiff urges acceptance of her assessment for the reason that it chronicles Plaintiff's condition. It is undisputed that Plaintiff has a bipolar disorder and suffers depression. The real question is the extent to which those conditions limit Plaintiff's ability to function globally. The history is meaningless if the person making the assessment is not qualified to do so. Nurse Corson was not and the ALJ was not required to defer to it.

The ALJ is not required to recite each piece of evidence supporting her residual functional capacity findings. The real test is whether the record as a whole substantially supports those findings. Such a requirement would result in unnecessarily lengthy opinions which further burden the administrative processing of claims. Further, the omission of detailed factual findings is not fatal where that omission does not affect the outcome of the case. Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999).

### C. FAILURE TO CONDUCT A PROPER CREDIBILITY ANALYSIS

Here, the Commissioner does not dispute that Plaintiff has both physical and mental limitations. The critical issue is not whether those limitations exist, but rather the degree in which those limitations impact Plaintiff's ability to engage in substantial gainful activity. The ALJ discounted Plaintiff's subjective complaints. The familiar standard for analyzing subjective complaints is set out in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

      1. the claimant's daily activities;

      2. the duration, frequency and intensity of the pain;

      3. precipitating and aggravating factors;

      4. dosage, effectiveness and side affects of medication;

      5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the record as a whole.

The ALJ properly analyzed the factors demanded by Polaski, and the key to her decision rests upon Plaintiff's credibility. In this regard, the ALJ noted that the medical records do not support Plaintiff's allegation of the severity of his condition. John D. Bentley, M.D., who treated Plaintiff at Jordan Valley Community Health Center, noted on August 13, 2003, that while Plaintiff was still having anger spells, he appeared to be improving. On November 24, 2003, Dr. Bentley recorded that Plaintiff continued to be quite anxious but the Klonopin and Effexor seemed to be working reasonably well. Then, in December 2003, Dr. Bentley opined that Plaintiff's severe anxiety attacks were under better control.

Dr. Bently's observations were supported by Dr. Geoffrey W. Sutton, a psychologist with the State Agency on Disability Determinations who completed a psychiatric review of Plaintiff from August 3, 2003 until November 13, 2003. Dr. Sutton indicated that Plaintiff's

-11-

affective disorders and anxiety-related disorders result in a non-severe impairment. Dr. Sutton concluded that Plaintiff's functional limitation restricting activities of daily living was mild; that his functional limitation in maintaining social functioning was mild; that his functional limitation in maintaining concentration, persistence or pace was mild; and, that there were no repeated episodes of decompensation for extended durations. In the consultant's notes portion of the form, Dr. Sutton opines that while Plaintiff has an impairment, his condition appears responsive to medications, that his hospital stay appeared to be associated with the discontinuation of those medications and that the impairment did not appear to be severe.

The ALJ is not required to adopt, without question, Plaintiff's assessment of his own condition. Rather, the ALJ's obligation is to conduct a credibility analysis using the Polaski v. Heckler blueprint. Here, the ALJ properly addressed the factors required by Polaski and she was justified in declining to credit Plaintiff's testimony fully.

### III. CONCLUSION

For the foregoing reasons, the Commissioner's final decision denying benefits is affirmed.

**IT IS SO ORDERED.**

/s/ *Ortrie D. Smith*
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

DATE: May 15, 2006